Roger K. GOENNER, Plaintiff,

v.

FARMLAND INDUSTRIES,
INC., Defendant.

No. 00–1499–WEB.

United States District Court,
D. Kansas.

Oct. 18, 2001.

*Memorandum and Order*

WESLEY E. BROWN, Senior District Judge.

Plaintiff Roger Goenner brought this action against his former employer, Farmland Industries, claiming the defendant terminated his employment in violation of Kansas public policy. Specifically, plaintiff contends Farmland fired him because he objected to false reports allegedly made by Farmland employees to the EPA and other agencies concerning a spill of petroleum product at Farmland's Coffeyville, Kansas, refinery. *See* Doc. 31 at 1. The matter is now before the court on three motions: Defendant's Motion for Summary Judgment, Defendant's Motion to Strike the Affidavit of Gene Hanks, and Plaintiff's Motion to Modify the Pretrial Order to add Gene Hanks as a witness. The court heard oral arguments on the motions on October 16, 2001, and issued an oral ruling at that time. This written memorandum will supplement the court's oral ruling.

I. *Facts.*

In keeping with the standards governing summary judgment, any facts in the parties' briefs not properly supported by the record have not been included in the following statement of facts. Any matters on which the record discloses a genuine dispute of fact have been construed in the plaintiffs' favor for purposes of determining whether the defendants are entitled to judgment as a matter of law.[1]

---

1. Plaintiff's method of setting forth the facts has made it difficult to determine which allegations have proper support in the record. Plaintiff's affidavit, which is cited as support for most of plaintiff's "Statement of Uncontroverted Facts," sets forth numerous assertions of fact without disclosing the means of plaintiff's personal knowledge of those facts. *Cf.* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). In an

At all times relevant to this action, defendant Farmland Industries, Inc., owned and operated a petroleum refinery in Coffeyville, Kansas.

In late 1997 or early 1998, Rick Laurentius, Farmland's refinery manager, began discussing with plaintiff the possibility of plaintiff beginning work for Farmland. Plaintiff had previously worked with Mr. Laurentius at Sinclair Oil Refinery in Wyoming.

During Mr. Laurentius' pre-employment discussions with plaintiff, Laurentius told plaintiff that Farmland was a good place to work, but that he would like plaintiff's help to "fix some of the things that are broken," including the fact that Farmland employees lacked industry-wide experience and that there were problems with Farmland's process safety management (PSM) program.

Plaintiff interviewed for employment with Mr. Laurentius and Coleman Ferguson, the general manager of Farmland's Coffeyville refinery. By letter of March 2, 1998, Coleman Ferguson offered plaintiff employment at the Coffeyville refinery.

On April 20, 1998, plaintiff began work at the refinery as area superintendent over three areas: Tank Farm/Distribution; the Fluid Catalytic Cracking (FCC) unit/Alkylation unit; and Utilities/Water Treatment.

Plaintiff reported to Mr. Laurentius, who reported to Coleman Ferguson.[2]

Plaintiff's duties were to optimize production, manage operations, maintenance, and personnel; and coordinate with safety and environmental within his areas.

Steve Lafferty was the plant safety manager, and Pete Hanley was the plant environmental manager. Pete Hanley truly believed in doing the best possible environmental function for the refinery. Keith Osborn and David Harmeyer were superintendents over two other areas of the Coffeyville refinery.

Plaintiff had five employees who reported directly to him and approximately 60–80 employees within his areas of responsibility.

When plaintiff began employment, he executed a document acknowledging that his employment was at-will. Plaintiff also received an employee handbook and executed a receipt and acknowledgment which reiterated that his employment was at-will.

*Farmland's Written Policies.*

Farmland's employee handbook contains a statement of Farmland's philosophy, which states in part:

Protect the environment.

Provide every employee with good, safe working conditions; fair wages and benefits; personal respect and recognition for good work.

Cultivate a climate of stewardship that empowers all employees to conduct

---

attempt to overcome this deficiency, plaintiff's affidavit states in conclusion that "the information provided was based upon my recollections, my careful review of the records produced by Farmland as well as my own research and review of records from environmental agencies. In addition, I have provided information based upon statements from fellow Farmland Refinery employees. This information forms the basis for the opinions and statements" in the plaintiff's statement of facts. Doc. 31, Exh. 1. This attempt to establish personal knowledge and competence to

testify on a matter via a blanket statement clearly contravenes the letter and spirit of Rule 56. Moreover, as the defendant points out, plaintiff's Statement of Uncontroverted Facts includes numerous allegations that do not appear in plaintiff's affidavit.

**2.** During oral arguments on the motion for summary judgment, counsel for plaintiff asserted that Laurentius did not report to Coleman Ferguson. Plaintiff's response to the motion for summary judgment, however, indicated that this fact was uncontroverted.

Farmland business in an environmentally sound and safe manner.

Maintain a work environment where employees' concerns are heard and addressed with mutual respect.

The employee handbook contains a business ethics and conflict of interest provision which states, in part:

Farmland will not tolerate dishonest or illegal conduct. Any Farmland employee who becomes aware of dishonest or illegal conduct has a responsibility to report it to appropriate management. When such a report is received, management has a duty to investigate and make an appropriate response.

The employee handbook also states, in part:

It is Farmland's philosophy to accept the responsibility of assuring every employee good, safe working conditions. Farmland makes every effort to meet the expectations of its employees by observing safety laws of the governmental bodies within whose jurisdiction we operate. No employee will knowingly be required to work in any unsafe manner. Safety is every employee's responsibility. Take the time to report any unsafe situations that could be a threat to you or other employees.... All employees are requested to do everything reasonable and necessary to keep the Company a safe place to work.

Plaintiff also received a "Code of Business Conduct," and executed a document indicating his agreement to abide by the letter and spirit of the principles and values stated therein.

The Code of Business Conduct provides, in part:

We will act in a fair and honest manner in all our endeavors-with our co-workers, member-owners, customers, suppliers and communities. We will conduct our business in a manner to comply with all applicable laws and regulations, both in the United States and other countries in which we do business. Adherence to the law is a minimum standard for our behavior.

\*      \*      \*      \*      \*      \*

Our employees are essential in achieving our corporate mission. Employees at all levels of the company, with their diverse talents, skills, and growth potential, provide a foundation of human commitment that can be inspired to achieve excellence. We encourage open and honest communication as a means for employees to express their ideas, opinions, attitudes and concerns without fear of reprisal.

The Code of Business Conduct also provides:

Protecting the environment and providing a healthful and safe workplace for every Farmland employee are of paramount importance. Productivity and product quality are enhanced by out dedication to this philosophy. Every Farmland employee is responsible for ensuring that our business activities are conducted in an environmentally sound and safe manner.

We all share responsibility for complying with applicable safety and health statutes, regulations and Farmland policies, and reporting potential violations. You should report a potential violation of the environmental protection, worker safety or transportation safety statutes, regulations and policies to your supervisor. You may contact Farmland's Environmental, Health and Safety department (EHS) at (816) 459–3880 or a Legal Division contact at (816) 459–6956 for guidance regarding particular technical or legal requirements. EHS also has a 24 hour emergency number which is (816) 346–3058.

The Code of Business Conduct also provides:

> Farmland maintains a confidential hotline to encourage employees to freely communicate their concerns or questions about violations of law or improper conduct, including but not limited to issues about environmental protection, worker safety, transportation safety, fraud and general ethical business conduct. Farmland employees, without regard to their position, may call the hotline number to make confidential reports concerning these matters. To assure the highest level of confidentiality, the calls to this hotline are answered by a staff of a company that is not owned, controlled or supervised by Farmland management. When employees call this hotline, they are not asked to identify themselves in any way.
>
> The hotline telephone number is:
> 1–800–326–LOSS

*Plaintiff's Employment with Farmland.*

On November 12, 1998, plaintiff was issued a letter of reprimand for violating Farmland's safe work permit policy by not obtaining an entry permit before entering a confined space. According to plaintiff, one of his subordinates falsely told him that he had obtained a permit.

As part of plaintiff's day-to-day duties, he interacted with the safety manager (Steve Lafferty) and environmental manager (Pete Hanley) on safety and environmental issues within his areas of responsibility. Whenever a safety or environmental issue arose, a meeting would be scheduled with area managers and the appropriate environmental or safety manager. The reason for discussing safety and environmental issues at the refinery was to solve problems, which was an ordinary part of doing business at the refinery. The vast majority of safety issues were discussed briefly and were quickly resolved. In plaintiff's view, the major items of training, documentation, Management of Change, and follow-up on incidents never seemed to get implemented.

Plaintiff never approached Mr. Ferguson with any concerns about environmental issues, but may have engaged in one or more informational-type discussions regarding water discharge quality.

Plaintiff recalls only two occasions that he approached Ferguson regarding safety issues. The first occurred in the summer of 1998, when plaintiff advised Ferguson of his intent to work with Steve Lafferty to implement changes to the Management of Change procedure. Ferguson told plaintiff to move ahead. The second was in August 1998, when plaintiff advised Ferguson of his work toward getting employees on a consistent schedule. On that occasion, Ferguson understood the importance of the issue, but recognized that it was something that plaintiff could handle with Mr. Laurentius.

Plaintiff had frequent discussions with Laurentius about safety and environmental issues. Plaintiff and Laurentius tended to see eye-to-eye on such issues.

Plaintiff also discussed safety and environmental issues with his peer, Keith Osborn. Plaintiff and Osborne tended to agree on safety and environmental issues, and plaintiff does not recall any significant disagreements on such issues.

Plaintiff also discussed safety and environmental issues with his peer, David Harmeyer. Plaintiff does not recall any significant disagreements with Harmeyer on any safety or environmental issues.

*The November 1998 Petroleum Spill.*

Due to a fire in the Hydrobon processing unit at the refinery on November 10, 1998, Farmland had to store quantities of

naphtha until the processing unit could be fixed. Naphtha is a partially refined petroleum product. By November 17th, Farmland had over 100,000 barrels of naphtha, with 15,000 to 25,000 additional barrels being generated each day. The refinery did not have enough spare tankage for the naphtha. Refinery management decided to store the naphtha in one of the raw crude tanks operated by Farmland's Pipeline Division out of Bartlesville, Oklahoma. These raw crude tanks were located across the Verdigris River from the refinery. Farmland Refinery had to pump the naphtha (and other refined products) to the raw crude tanks through a 12 inch transfer line running under the river. Although the pipeline was normally used to pump crude oil to the tank farm, sometime on November 16th, the Crude Unit began pumping naphtha to the tank farm.

The raw crude tank chosen for storing the naphtha was Tank 22A1. It is a 220,000 barrel storage tank normally used for crude oil. Tank gauging and level recording for the tank were done remotely in the Farmland Pipeline Division office in Bartlesville. On November 17, 1998, at around 8 p.m., the Sheriff's Department received complaints about a chemical smell. The sheriff subsequently called the Farmland Refinery, and Farmland employees investigated and found a spill near Tank 22A1. After receiving notice of the spill, Farmland Refinery called out Rick Laurentius, Keith Osborn, Pete Hanley, Coleman Ferguson, and members of the company's Emergency Response Team. Plaintiff was not called out as his unit had nothing to do with this pumping.

At 9:19 p.m. (CST) on November 17th, an unknown party called the National Spill Response Center (NSRC) to report the spill. The party reported the spilled material as crude oil. No Responsible Party was given to the NSRC. Farmland Pipeline Division records indicate that Darrel

Stonecipher of the Refinery Environmental Group placed this call.

At 9:43 p.m., Stonecipher notified the Kansas Department of Health and Environment of the spill. The spilled material was reported as crude oil, with no quantity estimate given.

At 10:00 p.m. (CST) on November 17th, Batch Upchurch of the Farmland Pipeline Division called the NSRC to report the spill. He reported it as crude oil, with no quantity estimate given. Farmland Pipeline was given as the Responsible Party.

Dean Nesvold of the refinery's Environmental Group notified the NSRC at 11:18 p.m. (CST) on November 17th, reporting the spill as crude oil, with an estimated quantity of 1000 barrels.

At 11:30 p.m. (CST) on November 17th, Brian Upchurch notified the NSRC, reporting the spill as crude oil, with an estimated quantity of 1,000 barrels.

Farmland asserts that these reports were given before any analysis of the material had been done and that it was generically reported as "crude oil."

At 7:30 a.m. on the morning of November 18th, Pete Hanley of Farmland notified the EPA Emergency Response Group of the spill and reported it as 1000 barrels of crude oil.

According to plaintiff, he arrived for work the next morning around 7:30 a.m. and was told by Jim Berry, Refinery Tankfarm Unit Supervisor, that refinery management and the refinery Environmental Group were reporting the spill as crude oil, but Berry knew the Crude Unit was pumping naphtha at the time of the spill.

After an 8:00 a.m. staff meeting, at around 8:30 a.m., plaintiff says that he met with Rick Laurentius as Laurentius was walking back to his office and told him the Refinery had been pumping naphtha, not

crude, at the time of the spill, and said Laurentius could not report it as crude. According to plaintiff, Laurentius's said that "Coleman Ferguson had decided the spill was going to be reported as crude, therefore it was crude." Plaintiff further claims Laurentius said it was easier and cheaper to clean up crude rather than refined products, and said it was important that the quantity of the spill be less than 1,000 barrels. Plaintiff says that he told Laurentius it was illegal to report the spill as crude.[3]

Plaintiff also brought up the spill in a conversation with Pete Hanley and told him it would be illegal to report the spill as crude oil. According to plaintiff, Hanley said that he took orders from Ferguson and Laurentius and did what they told him to do. Plaintiff says that he reminded Hanley that it was Hanley's name that appeared on documents relating to the spill.

On November 18th at 8:52 a.m., Dean Nesvold called KDHE to do a follow-up report on the spill. He reported 1550 total barrels of crude oil were spilled but 750 barrels were recovered at the spill site.

At 10:17 a.m. on November 18th, Pete Hanley faxed a letter to the Oklahoma Department of Environmental Quality reporting the spill as crude oil. The letter described Farmland's cleanup efforts and sought permission to conduct a controlled burn of the residual hyrdocarbon.

According to a Farmland affidavit (from Keith Osborn), on the morning of November 18th company management came to a preliminary conclusion as to the cause of the spill and determined that it was a mixture of crude oil and naphtha.[4]

Plaintiff says that sometime that morning after he talked to Laurentius, but before 10:30 a.m., Laurentius was interviewed by the press and disclosed that the spill included naphtha and crude oil. The fact that the spill included naphtha or "unfinished gasoline" appeared in press reports in the morning and afternoon of November 18th.

Between 10:30 a.m. and noon on November 18th, Coleman Ferguson issued several press releases on the spill. The press reports indicate that Ferguson described the spill as crude oil.

At 3:16 p.m. on November 18th, Andy Haar faxed a follow-up report to KDHE, reporting a crude oil pipeline leak and describing Farmland's response efforts. Farmland reported the material spilled as crude oil and stated that 1560 barrels were spilled, 760 barrels were recovered at the site, and an estimated 800 barrels were lost to the river.

At 4:30 p.m. on November 18th, plaintiff was asked to work at the spill site, to cover

---

**3.** In response to plaintiff's testimony, Rick Laurentius stated in his affidavit: "I do not recall any such conversation with Mr. Goenner, and I am confident that I never spoke to Refinery General Manager Coleman Ferguson or to anyone else about the November 18 conversation, or the fact that Mr. Goenner had raised any concern about the reporting of the nature of the petroleum that had spilled on November 17." Because the plaintiff's testimony controverts Laurentius' affidavit, the court assumes plaintiff's version to be true for purposes of the summary judgment motion.

**4.** Plaintiff claims that Farmland knew the spill was naphtha within an hour or two after they found the spill. In support of this allegation, plaintiff cites his own affidavit wherein he asserts that "Pete Hanley has stated that Farmland ... knew the spill was naphtha within an hour or two after they found the spill...." Plaintiff's affidavit does not set forth any circumstances showing his personal knowledge of this statement, nor has he set forth the circumstances under which Hanley allegedly made such a statement.

the night crew cleanup effort. Plaintiff and about 20 other refinery employees were bused to the spill site. Plaintiff was asked to serve as the night time Incident Commander.

Plaintiff and others returned for a second night of cleanup efforts. Plaintiff again served as the night time Incident Commander. Plaintiff and others worked from 6 p.m. on November 19th until 6 a.m. on November 20th. Plaintiff and others were asked not to return on the 20th, as Farmland hired outside contractors instead.

On December 1, 1999, Farmland Pipeline Division reported to the Federal DOT that the spill was crude and naphtha, and involved 1580 barrels, with 780 barrels recovered at the site. On December 2nd, Pete Hanley of Farmland notified the KDHE that the spill was crude and naphtha. This was the first acknowledgment to an agency that the spill was other than crude oil.

On February 26, 1999, the EPA issued a final report on the spill in which it described the material spilled as crude oil.[5]

In response to defendant's motion for summary judgment, plaintiff has submitted an affidavit of Gene Hanks, who was employed by a subcontractor hired by Farmland, in which Hanks says that he went to see Coleman Ferguson about a week after the spill. According to Hanks, as he approached Ferguson's office he heard Ferguson angrily saying to someone on the phone that "Roger would never keep quiet about this" and that Ferguson "was going to get rid of him."

When plaintiff returned from a vacation and went back to work on November 30th, he heard from co-workers that Coleman Ferguson was telling people he was going to fire plaintiff. Plaintiff says that on December 3rd, Ferguson called plaintiff into his office and yelled at him about bringing up safety issues and about contract administration. Ferguson was very upset.

According to plaintiff, in early February Rick Laurentius called him into his office and said he had to place plaintiff "on leave" because he had upset the Farmland management.

There is no record or explanation concerning the suspension in plaintiff's personnel file. Jerry Reed, Farmland's corporate human resources representative, understood that plaintiff was "given some time off to review his career at Farmland" and was sent home with pay for three months. There was no provision for such discipline in Farmland's employee handbook and no such action had ever been taken before. The Human Resources Manager, Jan Summers, asked constantly during this period why plaintiff was suspended but was never given an answer. She was asked during this period to put a memo in plaintiff's file relating to his entry permit violation, which had happened five months previously.

Plaintiff never had any conversation with Coleman Ferguson regarding the November 1998 spill. The issue of naphtha versus crude was never raised at any safety or environmental meetings that plaintiff attended. Prior to his termination, plain-

5. Assuming that the presence of naphtha was an important fact insofar as the agencies were concerned, it is somewhat puzzling why the EPA continued to refer to the spilled product as "crude oil" after it had been informed by Farmland that the spill included naphtha. Nevertheless, although no expert testimony

has been cited to establish it as a fact, for purposes of summary judgment the court has assumed that knowingly reporting a spill to an agency as "crude oil" when the spill in fact included a partially refined product such as naphtha would constitute a material and unlawful misrepresentation.

tiff never contacted any individual or agency outside of Farmland to raise any concerns about safety or environmental issues or any other form of improper conduct at Farmland. Plaintiff never placed a call to Farmland's confidential hotline to raise concerns about safety or environmental issues.

After he had been suspended, plaintiff contacted Jerry Reed, Farmland's director of human resources for the petroleum business and told him he had concerns regarding an alleged failure at the Coffeyville refinery to follow Farmland's process safety management regulations. Plaintiff allegedly told Reed there was a lack of training, lack of documentation, failure to follow Management of Change regulations, and failure to follow safety regulations at the refinery. According to plaintiff, he raised these matters with Reed primarily in the hope of preserving his job and also to protect the safety of Farmland employees. On February 27, 1999, plaintiff sent a memo to Reed as a follow up to their earlier conversation. The memo asserted that the refinery was failing to comply with OSHA regulations on an ongoing basis and was not properly overseeing contractors doing construction work at the refinery, but it did not mention the petroleum spill. The memo was also sent to Bob Honse, who was Executive Vice President and Chief Operating Officer of Farmland.[6]

On May 12, 1999, plaintiff received a phone call from Ken Heins asking him to come to the public library for a meeting with Heins and Coleman Ferguson. Plaintiff inquired whether Jerry Reed would be there, explaining that he had been told by Reed that the matter of his employment was to be handled solely through Reed. Plaintiff says Heins told him no one else could be there. After this call, plaintiff talked with Jan Summers and then attempted to call Heins back, but Heins was not there. Plaintiff left a message that he did not know if he could, or should, attend, because Jerry Reed said that he (Reed) was the sole person plaintiff was to deal with on his employment status. Shortly after leaving the message, plaintiff received a call from Coleman Ferguson, and subsequently a letter, in which Ferguson said plaintiff was terminated for refusing to come to the meeting to discuss his employment.

The parties' briefs address in some detail Farmland's asserted reasons for firing the plaintiff and plaintiff's assertion that those reasons are not credible. In view of the court's ruling below that plaintiff has failed to establish all the elements of a prima facie case of whistle-blowing, the court need not address whether Farmland's asserted reasons are a pretext for retaliation on account of whistle-blowing.

II. *Defendant's Motion to Strike Affidavit; Plaintiff's Motion to Amend the Pretrial Order.*

Defendant Farmland has moved to strike the affidavit of Gene Hanks, while plaintiff moves to amend the Pretrial Order to include Hanks as a witness. After considering the arguments set forth by the parties in their briefs, the court concludes that plaintiff's motion to add Hanks as a witness should be granted and defendant's motion to exclude Hank's affidavit should be denied.

---

**6.** Plaintiff has not relied upon the allegations in the above paragraph to support his whistle blowing claim. In his response to the motion for summary judgment, plaintiff objects to the relevance of his discussions with Jerry Reed, stating that those discussions "occurred long after Roger had reported the illegal conduct to the Refinery Manager-and long after Ferguson had told various people he was going to fire plaintiff." Doc. 31 at 32. *See also* Doc. 31 at 36–37.

When Gene Hank's testimony is considered, and accepted as true for purposes of summary judgment, his testimony together with the other evidence cited by plaintiff would be a sufficient basis upon which a reasonable jury could find that plaintiff "not keeping quiet about this" referred to plaintiff's complaint to Laurentius that declaring the spill to be crude was illegal, and that Ferguson retaliated against plaintiff because of this complaint. Even so, Hank's testimony does not affect the legal question of whether plaintiff's conversation with Laurentius qualified as a "report to company management" sufficient to establish a prima facie case of whistle-blowing under Kansas law.

### III. Defendant's Motion for Summary Judgment.

#### A. Arguments.

One of defendant's main contentions in its motion for summary judgment is that plaintiff's conversation with Rick Laurentius on November 18th does not qualify as protected activity within the meaning of Kansas whistle-blower law. Defendant points out that plaintiff never "went over Mr. Ferguson's head" to report the alleged unlawful conduct to upper management or to law enforcement officials. Relying primarily on *Fowler v. Criticare Home Health Services*, 27 Kan.App.2d 869, 10 P.3d 8 (2000), *affirmed*, 26 P.3d 69 (Kan. 2001), Farmland argues that a whistle-blower must seek out the intervention of a higher authority than the wrongdoer, and it contends that plaintiff's actions in talking about the issue with Coleman Ferguson's subordinate, Rick Laurentius, did not meet this requirement.

In response to this argument, plaintiff asserts that he has set forth evidence of the elements of a prima facie case of whistle-blowing. He cites several Kansas cases in which whistle blower claims have been upheld where the plaintiff reported the wrongdoing to individuals in company management. Plaintiff argues that he reported the wrongdoing to the Manager of the Refinery (Rick Laurentius)—the person who was in charge of the operation of the refinery—and that this clearly satisfies the requirement of reporting the matter to company management.

#### B. Discussion.

In *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988), the Kansas Supreme Court recognized a claim under Kansas law for retaliatory discharge for whistle-blowing. It said:

> To maintain such an action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report.

242 Kan. at 900, 752 P.2d 685. Additionally, the Court said, the reporting must have been done in good faith and the violation must have been reported to "either company management or law enforcement officials." *Id.*

For purposes of summary judgment, the court assumes plaintiff's evidence is sufficient for a reasonable jury to find all except the last element of a whistle-blower claim. As to this last requirement—that the violation must have been reported either to company management or to law enforcement—that element was recently interpreted in *Fowler v. Criticare Home Health Services*, 27 Kan.App.2d 869, 10 P.3d 8 (2000), *affirmed*, 26 P.3d 69 (Kan. 2001). In *Fowler*, the general manager of

a company had asked the plaintiff, who was the company's shipping manager, to ship two handguns and some ammunition to the company's owner via United Parcel Service. The plaintiff said he thought this would be illegal and he refused to do it. Moreover, he said that if the company shipped the guns, he would report this activity to UPS. The general manager of the company subsequently shipped the guns. The next day the plaintiff was late for work and his employment was terminated.

In finding that the employer was entitled to summary judgment on the plaintiff's whistle-blower claim, the Kansas Court of Appeals (and subsequently the Kansas Supreme Court) found that the plaintiff's discussion with the general manager of the company was not a report to company management within the meaning of the Kansas law:

> [Plaintiff's] disagreement with [the general manager] was just that; it did not qualify as an internal report to management of illegal coworker or company conduct. Further, we are unpersuaded by [plaintiff's] argument that Moore was the general manager, and that [plaintiff] understood the initial directive to have come from Moore's boss, the owner of the company. There was nothing about the fact that [plaintiff] worked for a smaller company that prevented him from reporting to law enforcement if he felt company reporting avenues were closed to him. *Palmer* simply was not meant to endow every workplace dispute over the water cooler on company prac-

tices and the effect of government regulation with whistle-blower overtones. A worker who wants to come under the protections of that decision must seek out the intervention of a higher authority, either inside or outside of the company.[7]

10 P.3d at 14–15.

■■■ Under the holding of *Fowler,* the court must find that plaintiff's discussion with Rick Laurentius did not constitute whistle-blowing under Kansas law. The only reasonable interpretation of *Fowler's* requirement of seeking out "a higher authority" or "higher management" is that it requires the plaintiff to report the wrongdoing to someone in authority above the wrongdoer. Reporting Ferguson's alleged wrongdoing to Ferguson's subordinate did not constitute "blowing the whistle." (This point is driven home by Laurentius' alleged response when plaintiff warned him the spill was not crude oil: "Coleman said it was crude that spilled, therefore it was crude."). Plaintiff's discussion with Laurentius did not reveal the alleged wrongdoing to Ferguson's superiors in corporate management or to law enforcement. In this respect it was identical to the discussion that took place in *Fowler;* it is more properly characterized as a workplace dispute than a report bringing to light illegal conduct. To qualify as whistle-blowing under *Fowler,* plaintiff had to seek out the intervention of a higher authority in the company, or, if there was no higher authority than Ferguson to report to, plaintiff had to seek out the intervention of law enforcement officials.[8] Because neither of

---

**7.** The *Fowler* court went on to state: "[Plaintiff] asks us to extend *Palmer's* protections to situations in which an employee has merely threatened to blow the whistle prior to his or her discharge. An employer's knowledge of the threat should be equivalent, [plaintiff] argues, to an employer's knowledge of the actual whistle-blowing. We simply do not believe

the Supreme Court intended *Palmer* to be so extended."

**8.** During oral arguments, defense counsel stated there was no one above Ferguson in the corporate hierarchy at the refinery but suggested plaintiff could have contacted "someone" at Farmland's corporate headquarters to report wrongdoing by Ferguson.

these things was done here, the court must find that the evidence cannot support a whistle-blower claim under the Kansas law. Accordingly, the defendant's motion for summary judgment will be granted, and judgment will be entered dismissing the claim on the merits.

## IV. *Conclusion.*

Defendant's Motion to Strike Affidavit (Doc. 32) is DENIED; Plaintiff's Motion to Amend the Pretrial Order (Doc. 35) is GRANTED; Defendant's Motion In Limine (Doc. 37) is DENIED as moot; and Defendant's Motion for Summary Judgment (Doc. 27) is GRANTED.

In accordance with the foregoing ruling, the Clerk is directed to enter a judgment of dismissal on the merits in favor of defendant Farmland Industries, Inc., with plaintiff to take nothing on his claim against the defendant.

IT IS SO ORDERED this day of October, 2001, at Wichita, Ks.

In addition, counsel pointed out that Farmland had a confidential "hotline" for reporting suspected wrongful conduct, but plaintiff did not use the hotline.